Reed, J.,
delivered the opinion of the court.
There are several errors assigned, only a few of which it will be necessary to discuss.
The admission of the evidence of several witnesses in regard to quarrels of the husband and wife and violent altercations when both were drunk, in a period of two years previous to the death, is assigned as error. This evidence was the first introduced. The corpus delicti had not been proved or attempted.
“ The corpus delicti in murder has two components: death as the result, and the criminal agency of another as the means.” And. Law Diet. “ The corpus delicti, in all cases of homicide, must be proved as an essential condition of conviction. To the corpus delicti, in this sense, * * * it is *98 requisite: 1st, that the deceased should have been shown to have died from the effect of a wound; 2nd, that it should appear that this wound was unlawfully inflicted, and that the defendant was implicated in the crime.” 1 Whart. Cr. Law, sec. 311. “ And even when the body has been found, and although indications of a violent death be manifest, it shall be fully and satisfactorily proved that the death was neither occasioned by natural causes, by accident, nor by the act of the deceased himself.” Stark, on Ev. 862, 863. “ The proof of the charge in criminal causes involves the proof of two distinct propositions: first, that the act itself was done; and, secondly, that it was done by the person charged, and by none other.” 3 Greenl. Ev., sec. 30.
The facts proved were no part of the res gestee; were in no way connected with the offense charged. Proof of periodical drunken quarrels of the husband and wife carried on for two years, ending in no serious injury and not characterized by any apparent intention to do great bodily injury, when the violence and altercation appeared to be mutual, and there was no proof of which was the aggressor and precipitated the collision, should not have been admitted at that stage of the proceeding. Such evidence was only admissible in connection with a well established corpus delicti, and it is very doubtful whether proof of such indefinite facts and acts would have been admissible in the case at any time. No corpus delicti having been proved, it was error to admit the evidence to assist in establishing a subsequent doubtful corpus delicti. Such evidence is never admissible except after the corpus delicti has been fully established; then only for the purpose characterizing the offense, as proof of malice, motive or criminal intention.
“ In the proof of criminal intent or guilty hnowledge, any other acts of the party, contemporaneous with the principal •transaction, may be given in evidence, * * * yet such evidence regularly ought not to be introduced, until the principal fact, constituting the corpus delicti, has been established.” *99 3 Greenl. Ev., sec. 19; 1 Greenl. Ev., sec. 53; Shaffner v. Commonwealth, 72 Pa. St. 60.
The whole of such evidence admitted only went to the proof of such facts and altercations when the parties were crazed and irresponsible from liquor, and that they continued to live together as husband and wife, and, as far as the proof went, peaceable when sober. Such being the established facts, the proof of such acts neither gave character to the offense charged, proved criminal intent or malice; consequently were not admissible for any purpose and must have been prejudicial to the defendant, furnishing a basis from which the jury might infer the fact of a subsequent killing.
The court erred in admitting evidence of the statements of deceased, characterized and admitted as dying declarations. The law in regard to the admission of such evidence is well settled and has been for an indefinitely long period; so well settled that it is hardly necessary to cite authorities, and only to state the well established elementary principles that control it. Dying declarations are in their nature secondary and hearsay evidence, an exception to the general rule. Such being the case, they are very carefully scrutinized.
“ Dying declarations are statements of material facts concerning the cause and circumstances of homicide made by the victim under the solemn belief of impending death, the effect of which upon the mind is regarded as equivalent to the sanctity of an oath. They are substitutes for sworn testimonj', and must be such narrative statements as a witness might properly give on the stand if living.” People v. Olmstead, 30 Mich. 431; Starkly v. People, 17 Ill. 21. They are admissible only in case of homicide where the death of the deceased is the subject of the charge, and the circumstances of the death are the subject of such declarations.
As before stated, the corpus delicti must be clearly, unequivocally established, that the condition and contemplated death were caused by violence, and the evidence must be such as to- negative clearly all probability of death from natural causes; then the circumstances attending the infliction of the *100 fatal injuries, and by whom inflicted, are admissible, not otherwise. Tested by these well settled rules, the supposed dying declarations were clearly inadmissible.
The attending physician at first supposed and reported it as a case of “grippe;” next, after an examination of the patient, and finding external bruises or discolorations, he adopted the supposition that the effect of the external violence had been to rupture internal organs, and that the patient was dying of such rupture.
Dr. Bilby was asked: “Now, doctor, please state to the jury what Mrs. McBride said to you at this time (morning of December 29) * * * concerning these bruises upon her body ? ” And he answered that she, in reference to each of them, said that they were inflicted by her husband.
Be no testified: “ I asked her if she was suffering from injuries inflicted by her husband and she nodded her head, ‘Yes.’ I then asked her if she had received these injuries some two or three weeks previous. She nodded her head, ‘Yes.’ That was about the only conversation I had .with her. * * * She was in a very low condition. I took the nod of the head as meaning yes. That was all the reply I got.”
Muloek testified: “ She said she was going to die. ‘ Oh,’ I says, ‘ I guess you will not.’ I said, ‘ Who hit you ? ’ She says, ‘ My husband has killed me. * * * He kicked me here ’ (on side) and it hurt'her arm and her eye. I told her, ‘ You will be all right in the morning; ’ and she said, ‘ No,’ I am afraid.’ ”
It will be observed that the theory of death by internal rupture adopted by the doctor had been accepted by the deceased and the parties Beño and Muloek, and in each instance she was asked who inflicted the external injuries, and she made the statements. Dr. Bilby stated that if the autopsy showed that there was no internal rupture : “Iwould, of course, have to give up that I was wrong.”
The autopsy showed conclusively no rupture; no connection whatever between the external injuries and the cause of death; hence the theory of Bilby was exploded and the *101 supposed dying declarations were inadmissible, pertaining to facts entirely independent and in no way connected with the cause of death. The alleged declarations made to Bilby were clearly inadmissible from the fact that they were made on the morning of the 29th, when he was giving her a hope of living, and the only evidence she gave of expected death was that she informed him that he could do her no good and need not return. Thirty-six hours afterwards he informed her there was no hope, and she realized the fact of impending death ,• but the declarations were not repeated, and he admitted that the two interviews had been combined. The alleged declarations testified by Reno were clearly inadmissible for another reason than the one stated above. To be admissible, the condition of the person must be shown, that there was sufficient consciousness and intelligence to comprehend and intelligently answer the questions. She did not speak; simply nodded her head. “ She was in very low condition.” There is no evidence of sufficient consciousness to comprehend the questions asked.
Mulock’s evidence was inadmissible, as it only pertained to the external injuries, and the alleged statement of the deceased “ My husband has killed me,” was clearly inadmissible. It was her opinion based upon that of her attending physician and perhaps others. Opinions in dying declarations are never admissible. 1 Greenl. Ev., sec. 159 ; 1 Bish. Cr. Proc., sec. 1211.
From what has already been said it will be apparent that the jury was misled by the improper evidence admitted and by the instructions of the court giving undue and unwarranted importance to the theory of the prosecution, persisted in and permeating the whole trial, which common justice required to be abandoned on the incoming of the evidence in regard to the corpus delicti. As already shown, the evidence must have been such as to absolutely establish the death resulting from violence and clearly negativing the possibility, or, at least, probability of death from natural causes. The testimony clearly showed that the cause or causes of death were *102 entirely disconnected from the external injuries. The cause or causes of death were not obscure, but patent — alcoholism, exposure, and exhaustion. After the supposed injuries were received and the supposed rupture of internal organs occurred, over two weeks had elapsed, during which, according to the statement made by her husband in her presence, and acquiesced in by her, she had been on a “ prolonged spree,” had consumed two gallons of liquor, had taken no nutrition. According to the evidence of the attending physician, by the use of alcohol, or some other agent, the lining membrane of the mouth and throat had been destroyed, turned white, as if burned by carbolic acid. Bright’s disease may have been an important factor, but an unnecessary one. The history of the woman’s habits for two years and the uncontradicted evidence established more natural causes of death than were necessary, without Bright’s disease.
In their periodical drunken conflicts she was, undoubtedly, the victim of violence and abuse. The external injuries, if inflicted by him, may have affected more or less a person in her prostrate condition, but there is an utter want of evidence that they caused death. As to how they were received is left equally in doubt; may have been caused by the husband, or by falling over furniture in the house; when she fell down cellar; when she fell in the yard or in the ravine. Her own unfortunate habits, as shown, were such that the external injuries might readily have been the result of her own accidents.
One instruction (Number 20-J-) is particularly objectionable. It is: “ The fact, if it be a fact, that the defendant fled from the neighborhood in which he was living at the time of the commission of the alleged offense, is a circumstance proper to be considered by you in connection with all the other circumstances proved upon this trial.”
There was no evidence in its support; was at variance with the testimony. He was with his wife and doctor on the morning of December 28th, informed the doctor he was going away. The supposed injury was inflicted two weeks *103 or more before that time. All the evidence there is, is to the effect that he went by the advice of the wife to avoid arrest for the sale of liquor without a license, and only went into an adjoining county, the distance of a few miles. The family knew where he was. The boy testified: “ Mother died December 31st, at night. Father was at Houston’s. He went Monday morning.”
In view of the entire evidence as discussed above, several of the instructions should not have been given, but it is unnecessary to review them. The other assignments of error need not be considered. For the causes stated the judgment must be reversed.

Reversed.